**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MIELLE ORGANICS, LLC, | |
| Plaintiff, | Case No. 1:25-cv-00611 |
| v. | Judge: |
| THE INDIVIDUALS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, UNINCORPORATED ASSOCIATIONS AND OTHERS IDENTIFIED IN COMPLAINT "SCHEDULE A", | Magistrate Judge: |
| Defendants. | |

**COMPLAINT**

Plaintiff, Mielle Organics, LLC ("Plaintiff" or "Mielle"), by and through its undersigned counsel, UB Greensfelder LLP, hereby brings the present action against the individuals, corporations, limited liability companies, partnerships, unincorporated associations, and others identified in Complaint "Schedule A" (collectively, "Defendants"), and hereby alleges as follows:

**INTRODUCTION**

1.     This action has been filed by Plaintiff to combat foreign e-commerce store operators who trade upon Plaintiff's reputation and goodwill by offering for sale and/or selling unauthorized and unlicensed products, including hair and skin care products which use infringing and counterfeit versions of Plaintiff's federally registered trademarks (the "Counterfeit Plaintiff Products").

2.     Plaintiff is a well-known hair and skin care product company founded by entrepreneurs who worked tirelessly to grow the brand. Plaintiff's hair and skin care products are FDA regulated cosmetics under U.S. law. Due to their widespread application in daily use, the FDA considers hair and skin care products to be a crucial concern because low quality products

(such as counterfeits) can potentially expose consumers to hazardous chemicals and elements that can cause harm, injury, or adverse reactions. There are serious consumer health and safety issues that arise from the use of Counterfeit Plaintiff Products which may have been altered.

3. Defendants, operating from the People's Republic of China or other foreign jurisdictions, created numerous Defendants' Internet Stores that are designed to appear to sell genuine Mielle products, but in actuality sell inferior imitations of products bearing Plaintiff's federally registered trademarks to unknowing consumers. Here is a photo of an authentic product and one of the counterfeit products sold by one of the Defendants:

| Authentic Product | Defendant Product |
|---|---|
|  | |

4. The Defendants' Internet Stores share unique identifiers, such as design elements and similarities between the unauthorized counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to

avoid and mitigate liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of Plaintiff's federally registered trademarks, as well as to protect unknowing consumers from purchasing counterfeit products over the Internet. Plaintiff has been and continues to be irreparably damaged through consumer confusion, dilution, and tarnishment of its valuable trademarks as a result of Defendants' actions and seeks injunctive and monetary relief.

## JURISDICTION AND VENUE

5. This Court, the United States District Court for the Northern District of Illinois, Eastern Division (hereinafter, the "Judicial District"), has original subject matter jurisdiction over the claims contained in this Complaint pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331. This Court also has jurisdiction over the claims contained in this Complaint that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts. This is an action brought by Plaintiff, the owner of the Mielle trademarks, against several online sellers of counterfeit Mielle branded products, specifically counterfeit Mielle hair and skin care products. This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this Judicial District, and the acts and events giving rise to this lawsuit, of which each Defendant stands accused, were undertaken in Illinois and within this Judicial District. In addition, each Defendant has offered to sell and ship infringing products into this Judicial District. Each and every one of the Defendants identified in Schedule A have shipped a counterfeit Mielle product into the State of Illinois.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities towards consumers within the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the Defendants' domain names and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendants' Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive e-commerce stores through which Illinois residents can purchase products, including hair and skin care products bearing counterfeit versions of Plaintiff's federally registered trademarks. Each of the Defendants has targeted sales from Illinois residents by setting up and operating online stores that offer shipping to the United States, including Illinois, accepting payment in U.S. dollars and/or funds from U.S. bank accounts, and, on information and belief, has sold unauthorized products using infringing and counterfeit versions of Plaintiff's federally registered trademarks to residents of Illinois. Each and every one of the Defendants identified in Schedule A have shipped a counterfeit Mielle product into the State of Illinois. Each of the Defendants is committing tortious acts in Illinois, engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

**THE PLAINTIFF**

7.      Plaintiff, Mielle Organics, LLC, is a limited liability company organized and existing under the laws of Delaware with its principal place of business in the state of Indiana.

8.      Mielle produces a well-known line of trademarked products including conditioners, hair masques, moisturizers, oils, scalp treatments, shampoos, and styling products, that prominently display the internationally recognized and federally registered Mielle Trademarks

4

(collectively, the "Genuine Mielle Products"), and are enormously popular and sold throughout the United States.

9.     Genuine Mielle Products are distributed and sold through authorized retailers, internationally and throughout the United States, including, Illinois, through mielleorganics.com, online marketplaces like Amazon, and brick and mortar retailers like Ulta Beauty, CVS, and Target.

10.     The U.S. Food and Drug Administration provides standards for the manufacturing of Genuine Mielle Products. Genuine Mielle Products are regulated cosmetics in the United States by the U.S. Food and Drug Administration under the Federal Food, Drug, and Cosmetic Act and the Fair Packaging and Labeling Act which prohibits the marketing of adulterated or misbranded cosmetics in interstate commerce. Counterfeit hair and skin care products pose significant health and safety concerns to Americans around the country and residents of Illinois within the Judicial District.

11.     The Mielle Organics trademark was first used in commerce in 2014 and became a registered trademark for hair and skin care products in 2016.

12.     Long before Defendants' acts described herein, Plaintiff launched its Genuine Mielle Products bearing its well-known logos and registered trademarks. For years, Plaintiff's brand has been a world leader in the field of hair and skin care products.

13.     The Mielle trademarks have been in use for many years and hair and skin care products have been continuously sold under the Mielle trademarks. As a result of this long-standing use, Mielle owns common law trademark rights in the Mielle trademarks. The consistent use of the marks has also built substantial goodwill in and to the Mielle trademarks. The Mielle

trademarks are well-known marks and valuable assets of Plaintiff. Genuine Mielle Products typically include at least one of the federally registered Mielle trademarks or brand logos.

14.     Several of the Mielle Trademarks are registered with the United States Patent and Trademark Office ("USPTO") (collectively referred to as "Mielle Trademarks"), a non-exclusive list of which is included below:

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 5,264,690 | MIELLE | Aug. 15, 2017 (incontestable) | CL 003:<br>Hair care lotions; Hair care preparations; Hair creams; Cosmetic hair dressing preparations; Hair care lotions; Hair care preparations; Hair care preparations consisting of organic coconut virgin oil and coconut virgin oil; Hair care products, namely, heat protection sprays; Hair cleaning preparations; Hair conditioner; Hair conditioners; Hair conditioners for all types of natural hair; Hair creams; Hair curling preparations; Hair dressings for women; Hair gel; Hair gel and hair mousse; Hair gels; Hair sheen spray; Hair sprays; Hair sprays and hair gels; Hair straightening preparations; Hair styling fixative in the nature of hair wax; Hair texturizers; Hair tonics; Hair waving preparations; Hair wax; Moisturizing creams; Moisturizing milks; Non-medicated hair treatment preparations for cosmetic purposes; Pomades for all types of natural hair for cosmetic purposes; Pomades for all types of natural hair for cosmetic purposes; Preparations for setting hair; Styling foam for hair; Styling gels; Styling sprays for all types of natural hair |
| 4,912,786 | MIELLE ORGANICS | Mar. 8, 2016 | CL 003:<br>3-in-1 hair conditioners; 3-in-1 hair shampoos; 3-in-1 organic soap bars for use as soap, shampoo and conditioner; Baby hair conditioner; Baby lotion; Beauty lotions; Beauty milks; Beauty soap; Body cream; Body milks; Body oils; Cosmetic |

| | | | hair dressing preparations; Cosmetic hair regrowth inhibiting preparations; Essential oils; Fragrances; Hair balsam; Hair butter; Hair care creams; Hair care lotions; Hair care preparations; Hair care preparations consisting of organic coconut virgin oil and coconut virgin oil; Hair care products, namely, heat protection sprays; Hair cleaning preparations; Hair colouring preparations; Hair conditioner; Hair conditioners; Hair conditioners for babies; Hair conditioners for all types of natural hair; Hair creams; Hair curling preparations; Hair dressings for men; Hair dressings for women; Hair gel; Hair gel and hair mousse; Hair gels; Hair glaze; Hair lotion; Hair lotions; Hair mascara; Hair masks; Hair mousse; Hair mousses; Hair nourishers; Hair oils; Hair pomades; Hair products, namely, thickening control creams; Hair rinses; Hair shampoo; Hair shampoos and conditioners; Hair shampoos for all types of natural hair; Hair sheen spray; Hair sprays; Hair sprays and hair gels; Hair straightening preparations; Hair styling fixative in the nature of hair wax; Hair styling gel; Hair styling preparations; Hair styling spray; Hair texturizers; Hair tonics; Hair waving preparations; Hair wax; Moisturizing creams; Moisturizing milks; Non-medicated hair treatment preparations for cosmetic purposes; Non-medicated preparations all for the care of skin, hair and scalp; Oil baths for hair care; Perfume oils; Pomades for all types of natural hair; Preparations for setting hair; Shampoo-conditioners; Shampoos; Shampoos for babies; Shower and bath foam; Shower and bath gel; Shower creams; Shower gel; Shower gels; Styling clay for hair; Styling foam for hair; Styling gels; Styling gels for all types of natural hair; Styling lotions; Styling mousse; Styling paste for hair; Styling sprays for all types of natural hair, all of the aforementioned goods not |
|---|---|---|---|

| | | | containing honey and made of organic ingredients |
|---|---|---|---|
| 7,196,319 |  | Oct. 17, 2023 | CL 003: Hair care preparations, namely, shampoo and conditioner, hair creams, heat protection sprays, hair butter, hair lotions, hair masks, hair mousses, hair sheen spray, hair gels, hair oils, hair pomades, styling clay; beauty masks; beauty serums; non-medicated preparations all for the care of skin, hair and scalp |

15.    The above U.S. registrations for Mielle Trademarks are valid, subsisting, in full force and effect, and some are incontestable (where noted as such) pursuant to 15 U.S.C. § 1065. The registrations for Mielle Trademarks constitute *prima facie* evidence of their validity and of Plaintiff's exclusive right to use Mielle Trademarks pursuant to 15 U.S.C. § 1057(b). Mielle Trademarks have been used exclusively and continuously by Plaintiff for many years and have never been abandoned. Plaintiff has also registered its trademarks with the USPTO for which true and correct copies of the United States Registration certificates for the above-listed trademarks are included in **Exhibit 1** attached hereto.

16.    Mielle Trademarks are exclusive to Plaintiff and are displayed extensively on Genuine Mielle Products and in marketing and promotional materials. Mielle Trademarks have been the subject of substantial and continuous marketing and promotion at great expense. Significant resources are spent annually in advertising, promoting, and marketing featuring Mielle Trademarks. These promotional efforts include—but are not limited to—substantial print media, websites, social media sites, and point of sale materials. Because of these and other factors, Mielle Trademarks have become well-known throughout the United States.

17.    Mielle Trademarks are distinctive when applied to Genuine Mielle Products, signifying to the purchaser that the products come from Plaintiff.

8

18. Genuine Mielle Products have also been extensively promoted on www.mielleorganics.com. Sales of Genuine Mielle Products are significant, and consumers can purchase authentic Genuine Mielle Products on this website. The website features proprietary content, images, and designs exclusive to Plaintiff's brand and trademarks.

19. Genuine Mielle Products and Mielle Trademarks have received significant media coverage, including in national publications as well as in numerous online publications and websites.

20. Since the initial launch of the Genuine Mielle Products, Mielle Trademarks have been the subject of substantial and continuous marketing and promotion. Mielle Trademarks are consistently marketed and promoted in the industry and to consumers through traditional print media, video commercials, websites, social media platforms, product packaging, and point of sale materials.

21. Substantial time, money, and other resources have been spent in developing, advertising, and otherwise promoting Mielle Trademarks. In fact, significant sums annually have been spent in advertising, promoting, and marketing featuring the Mielle Trademarks. Genuine Mielle Products have also been the subject of extensive publicity resulting from their innovative products. As a result, products bearing the Mielle Trademarks are widely recognized and exclusively associated by consumers, the public, and the industry as being quality products sourced from Plaintiff. Genuine Mielle Products have become among the most popular of their kind in the U.S.

22. Mielle Trademarks have achieved tremendous fame and recognition which has only added to the inherent distinctiveness of the marks. Indeed, Mielle is one of the United States' most

popular hair and skin care brands. As such, the goodwill associated with the Mielle Trademarks is of incalculable and inestimable value to Plaintiff.

## THE DEFENDANTS

23.     Defendants are individuals and business entities of unknown makeup who, upon information and belief, understand they are selling counterfeit Mielle products. Defendants conduct business throughout the United States, including Illinois and within this Judicial District, through the operation of the fully interactive e-commerce websites and online marketplaces operating under the Defendants' Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell unauthorized, Counterfeit Plaintiff's Products to consumers within the United States, including the State of Illinois and this Judicial District. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

24.     Upon information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products using unauthorized counterfeit versions of the Mielle Trademarks in the same transaction, occurrence, or series of transactions or occurrences. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their network. In the event that Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend its Complaint.

25.     Because the Defendants are selling counterfeit products that are cosmetic products under U.S. law, the severity of this counterfeiting activity is even more pronounced than usual. A counterfeit hair or skin care product can cause significant product failure and harm to the user.

10

## THE DEFENDANTS' UNLAWFUL CONDUCT

26.     The success of Plaintiff's brand has resulted in its counterfeiting. Consequently, Plaintiff has a worldwide brand protection program and regularly investigates suspicious online marketplace listings identified in proactive internet sweeps and reported by consumers. Plaintiff has identified numerous fully interactive e-commerce stores or websites and online marketplace listings on platforms such as eBay, Aliexpress, Alibaba, and Walmart including the Defendants' Internet Stores, which were offering for sale, selling, and importing Counterfeit Plaintiff's Products to consumers in this Judicial District and throughout the United States. Despite Plaintiff's enforcement efforts, Defendants have persisted in creating the Defendants' Internet Stores.

27.     The U.S. Customs and Border Protection ("CBP") estimates for the fiscal year 2023 goods that violate Intellectual Property Rights ("IPR") were valued over $2.7 billion by Manufacturer's Suggested Retail Price. *See* **Exhibit 2**, THE TRUTH BEHIND COUNTERFEITS, http://cbp.gov/trade/fakegoodsrealdangers (last visited Jan. 15, 2025). Nearly 66% of all CBP IPR seizures came from China in fiscal year 2023. *Id.* U.S. Customs specifically noted that "**Phony cosmetics are unsafe due to the potential use of harmful ingredients. Consumers must safeguard purchases by shopping from reputable sources, checking ingredients, and verifying online sellers.**" *Id.* The combined traffic to 48 websites selling counterfeit goods was over 240,000 visits per day on average, or more than 87 million visits per year. *See* **Exhibit 3,** a January 2011 Mark Monitor report entitled "Traffic Report: Online Piracy and Counterfeiting." E-commerce sales, including those through third-party platforms, resulted in a sharp increase in small packages into the U.S. annually. *See* **Exhibit 4,** "Intellectual Property Rights Seizure Statistics: Fiscal Year 2020" prepared by the U.S. Customs and Border Protection. In 2020, it was estimated there were 184 million express shipments and 356 million international mail shipments. *Id.*

Counterfeiters also ship products in small quantities via international mail to minimize detection by CBP. Over 90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large shipping containers). *Id*.

28.     Internet websites like the Defendants' Internet Stores are also estimated to contribute to tens of thousands of lost jobs for legitimate businesses and broader economic damages such as lost tax revenue every year. *See* **Exhibit 5**, a Frontier Economics report prepared for BASCAP (Business Action to Stop Counterfeiting and Piracy) and INTA (The International Trademark Association) entitled "The Economic Impacts of Counterfeiting and Piracy".

29.     Defendants facilitate sales by designing the Defendants' Internet Stores so that they appear to unknowing consumers to be authorized retailers, outlet stores, or wholesalers selling genuine products. Defendants' Internet Stores often include content, images, and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website. Defendants further perpetuate the illusion of legitimacy by offering content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer.

Authentic Website[1]:

---

[1] ROSEMARY MINT SCALP & HAIR STRENGTHENING OIL, https://mielleorganics.com/products/rosemary-mint-oil (last visited Jan. 15, 2025).



Defendant Listing[2]:



30.     Plaintiff has neither licensed nor authorized Defendants to use Mielle Trademarks and none of the Defendants are authorized retailers of Genuine Mielle Products.

31.     Defendants deceive unknowing consumers by using Mielle Trademarks without authorization within the content, text, and/or meta tags of websites in order to attract various search engines looking for websites relevant to consumer searches for Genuine Mielle Products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so the Defendants' Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for Genuine Mielle Products. Defendants only show Mielle Trademarks in product images while using strategic

---

[2] 1 MIELLE ORGANICS ROSEMARY MINT SCALP & HAIR STRENGTHENING OIL,
https://www.ebay.com/itm/387584448759?itmmeta=01JFAQ6TQ29PCJ7YWNABC2JXPR&hash=item5a3dd558f7
:g:azkAAOSw5oJnKwg~ (last visited Jan. 15, 2025).

item titles and descriptions that will trigger their listings when consumers are searching for Genuine Mielle Products. Further, Defendants utilize similar illegitimate SEO tactics to propel new Defendants' Internet Stores listings to the top of search results after others are shut down. As such, Plaintiff seeks to disable the Defendants' Internet Stores owned by Defendants through which their counterfeit products are sold.

32. Defendants have engaged in fraudulent conduct when registering Defendants' Internet Stores by providing false, misleading and/or incomplete information to e-commerce platforms. On information and belief, certain Defendants have anonymously registered and maintained Defendants' Internet Stores to prevent discovery of their true identities and the scope of their e-commerce operation.

33. Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendants' Internet Stores. For example, many of Defendants' names and physical addresses used to register their Defendants' Internet Stores are incomplete, contain randomly typed letters, or fail to include cities or states. Other Defendants' Internet Stores use privacy services that conceal the owners' identity and contact information. Upon information and belief, some of the tactics used by the Defendants to conceal their identities and the scope and interworking of their counterfeit operations to avoid being shut down include regularly creating new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other fictitious names and addresses. Defendants' Internet Stores registration patterns are sophisticated and regularly confuse consumers residing in the Judicial District.

34. Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendants' Internet Stores. For example, some of the Defendants' websites

have identical layouts, even though different aliases were used to register their respective domain names. In addition, the counterfeit products for sale in the Defendants' Internet Stores bear similarities and indicia of being related to one another, suggesting that the counterfeit products were manufactured by a common source and that Defendants are interrelated. The Defendants' Internet Stores also include other notable common features, including use of the same registration patterns, accepted payment methods, checkout methods, meta data, shopping cart platforms, illegitimate SEO tactics, lack of contact information, HTML user-defined variables, domain redirection, identically or similarly priced items, volume sales discounts, similar hosting services, similar name servers, the same incorrect grammar and misspellings, and the use of the same text and images—including content copied from Plaintiff's official websites.

35.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, when counterfeiters like Defendants receive notice of a lawsuit they will often register new domain names or online marketplace accounts under new aliases and move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring take down demands sent by brand owners. Counterfeiters will also ship products in small quantities via international mail to minimize detection by CBP. Over 90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large shipping containers). A 2020 CBP media release on seizures of illicit goods from China reports "the explosive growth of e-commerce has generated a substantial increase in international mail and express consignment shipments. Foreign sellers are exploiting this trend to ship counterfeit and other illicit goods into the United States and to commit other trade violations." *See* **Exhibit 6**, a September 2020 U.S. CBP Press

Release regarding Operation Mega Flex. On average, CBP processes more than 420,000 parcels of mail and 180,000 express consignment shipments from China each day. CBP has found that approximately 12.5% of targeted parcels contain counterfeit goods or contraband.

36. Third party service providers like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." *See* **Exhibit 7**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 Nw. J. Int'l L. & Bus. 157, 186 (2020); *See also*, a report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020) attached as **Exhibit 8**, which found that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "significantly enhanced vetting of third-party sellers" is necessary. Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts. *See* Exhibit 8 at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. *See* Exhibit 8 at p. 39. Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." *See* Exhibit 7 at 186-187.

37. In the summer of 2019, the USPTO partnered with the Federal Research Division within the Library of Congress for research and analytical support examining various aspects of domestic and international counterfeit trade, including the overall magnitude of the markets, the

16

impacts on the U.S. economy, the role of the private sector in limiting exploitations, trends in trade via small parcels, risks to public health and safety, consumer attitudes toward such products, and the use of social media to facilitate the sale of counterfeit. The resulting February 2020 report entitled *U.S. Intellectual Property and Counterfeit Goods – Landscape Review of Existing/Emerging Research* found that as of 2018, counterfeiting is the largest criminal enterprise in the world, with domestic and international sales of counterfeit and pirated goods totaling between an estimated $1.7 trillion and $4.5 trillion a year—a higher amount than either drugs or human trafficking. Around 80% of these goods are produced in China, and sixty percent to eighty percent of those products are purchased by Americans. Both statistics provide a general sense of the significant impacts such illicit trade has on the U.S. economy, U.S. business interests, and U.S. innovations. *See* **Exhibit 9,** a report entitled "U.S. Intellectual Property and Counterfeit Goods – Landscape Review of Existing/Emerging Research" prepared by the Federal Research Division of the Library of Congress under an interagency agreement with the USPTO, U.S. Department of Commerce.

38.     Counterfeit Plaintiff Products pose a safety risk to the public. Due to their widespread application in daily use, hair and skin care products are a crucial concern because they can expose consumers to hazardous chemicals and elements that can cause harm, injury, or adverse reactions. *See* **Exhibit 9** at 28. "Fake personal care items such as cosmetics have been found to contain everything from harmful bacteria to human waste." *See* **Exhibit 8** at 16.  "Health and safety risks extend far beyond fake prescription drugs. Counterfeit cosmetics often contain ingredients such as arsenic, mercury, aluminum, or lead and may be manufactured in unsanitary conditions, which can ultimately lead to problems with one's eyes or skin." *See* **Exhibit 8** at 18.

39. The 2021 Review of Notorious Markets for Counterfeiting and Piracy, prepared by the Office of the United States Trade Representative, an Executive Office of the President, reports that commercial-scale copyright piracy and trademark counterfeiting cause significant financial losses for U.S. right holders and legitimate businesses, undermine critical U.S. comparative advantages in innovation and creativity to the detriment of American workers, and pose significant risks to consumer health and safety. Counterfeit product manufacturing occurs in illicit operations that by nature do not operate within the wide range of regulations, licensing requirements, government oversight, and government inspections that not only ensure products are safe for consumers, but also ensure that the rights of workers are protected. The informal economy in which counterfeiting thrives makes the occurrence of labor abuses, including forced labor and child labor, in counterfeit production sites difficult to detect and report. China is the top country of origin for counterfeit goods seized by CBP as well as the country with the greatest number of products made with forced labor, including state-sponsored forced labor. The Biden administration added WeChat's e-commerce ecosystem and AliExpress, an e-commerce site owned by Alibaba, to this Notorious Market list. A true and correct copy of this report is attached hereto as **Exhibit 10**.

40. Further, counterfeiters such as Defendants typically operate multiple credit card merchants and various seller accounts behind layers of payment gateways so that they can continue to operate in spite of Plaintiff's enforcement efforts. Upon information and belief, many counterfeiters maintain off-shore bank accounts and regularly move funds from their accounts to off-shore bank accounts outside the jurisdiction of this Court.

41. Defendants, without any authorization or license from Plaintiff, have knowingly and willfully used and continue to use Mielle Trademarks in connection with the advertisement, distribution, offering for sale, and sale of unauthorized Counterfeit Plaintiff Products into the

United States and Illinois over the Internet. All of Defendants' Internet Stores offer shipping to the United States, including Illinois, and on information and belief, each Defendant has offered to sell unauthorized Counterfeit Plaintiff Products into the United States, including Illinois.

42.     Defendants' use of Mielle Trademarks in connection with the advertising, distribution, offering for sale, and sale of unauthorized Counterfeit Plaintiff Products, including the sale of unauthorized Counterfeit Plaintiff Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

43.     Plaintiff repeats, re-alleges, and incorporates by reference herein the allegations contained in paragraphs 1-42 of this Complaint.

44.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered Mielle Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. Mielle Trademarks are highly distinctive marks.

45.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of Mielle Trademarks without Plaintiff's permission.

46.     Plaintiff is the exclusive registered owner of Mielle Trademarks. *See* Exhibit 1. The United States Registrations for Mielle Trademarks are in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiff's rights in Mielle Trademarks and are willfully infringing and intentionally using Mielle Trademarks on Counterfeit Plaintiff Products. Defendants' willful, intentional, and unauthorized use of Mielle Trademarks is likely to cause and

is causing confusion, mistake, and deception as to the origin and quality of the unauthorized Counterfeit Plaintiff Products among the general public.

47.     Defendants' activities constitute willful trademark infringement and counterfeiting under 15 U.S.C. § 1114.

48.     The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of unauthorized Counterfeit Plaintiff Products.

49.     Plaintiff has no adequate remedy at law, and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its well-known Mielle Trademarks.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

50.     Plaintiff repeats, re-alleges, and incorporates by reference herein the allegations contained in paragraphs 1-49 of this Complaint.

51.     Defendants' promotion, marketing, offering for sale, and sale of unauthorized Counterfeit Plaintiff Products have created and are creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval by Plaintiff of Defendants' unauthorized Counterfeit Plaintiff Products.

52.     By using Mielle Trademarks in connection with the sale of unauthorized Counterfeit Plaintiff Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the unauthorized Counterfeit Plaintiff Products.

53.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the unauthorized Counterfeit Plaintiff Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

54.     Plaintiff has no adequate remedy at law and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its brand and Mielle Trademarks.

## COUNT III
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS § 510/1, et seq.)

55.     Plaintiff repeats, re-alleges, and incorporates by reference herein the allegations contained in paragraphs 1-54 of this Complaint.

56.     Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their counterfeit products as those of Plaintiff, causing likelihood of confusion and/or misunderstanding as to the source of its goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with Genuine Mielle Products, representing that their unauthorized Counterfeit Plaintiff Products have Plaintiff's approval when they do not, and engaging in other conduct which creates likelihood of confusion or misunderstanding among the public.

57.     The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/1 et seq.

58.     Plaintiff has no adequate remedy at law, and Defendants' conduct has caused Plaintiff to suffer damage to his reputation and goodwill. Unless enjoined by the Court, Plaintiff will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against each of the Defendants as follows:

1)      That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

a.      using Mielle Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a Genuine Mielle Product or is not authorized by Plaintiff to be sold in connection with Mielle Trademarks;

b.      passing off, inducing, or enabling others to sell or pass off any product as a Genuine Mielle Product or any other product produced by Plaintiff that is not Plaintiff's or is not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the Mielle Trademarks;

c.      committing any acts calculated to cause consumers to believe that Defendants' unauthorized Counterfeit Plaintiff Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d.      further infringing Mielle Trademarks and damaging Plaintiff's reputation and goodwill;

e.      manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by

Plaintiff to be sold or offered for sale, and which bear any of Mielle Trademarks, including any reproductions, counterfeit copies, or colorable imitations of Genuine Mielle Products;

      f.     using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendants' Internet Stores, or any other domain name or online marketplace account that is being used to sell or is the means by which Defendants could continue to sell unauthorized Counterfeit Plaintiff Products;

      g.     operating and/or hosting websites at the Defendants' domain names and any other domain names registered or operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing Mielle Trademarks or any reproduction, counterfeit copy, or colorable imitation thereof that is not a genuine product or not authorized by Plaintiff to be sold in connection with its trademarks;

      h.     otherwise competing unfairly with Plaintiff in any manner;

2)     Entry of an Order that, at Plaintiff's choosing, the registrant of the Defendants' domain names shall be changed from the current registrant to Plaintiff, and that the domain name registries for the Defendants' domain names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Defendants' domain names to a registrar of Plaintiff's selection, and that the domain name registrars take any steps necessary to transfer the Defendants' domain names to a registrar of Plaintiff's selection; or that the same domain name registries shall disable the Defendants' domain names and make them inactive and non-transferable;

3)     Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as AliExpress,

Alipay, Amazon, Aliexpress, Alibaba, eBay, PayPal, Wish, DHgate, Walmart.com, web hosts for the Defendants' domain names, and domain name registrars (collectively, the "Third Party Providers"), shall:

       a.     disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit products using Mielle Trademarks including any accounts associated with the Defendants listed in Schedule A;

       b.     disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit products and infringing goods using Mielle Trademarks; and

       c.     take all steps necessary to prevent links to the Defendants' Internet Stores identified in Schedule A from displaying in search results, including, but not limited to, removing links to the Defendants' domain names and online marketplace accounts from any search index.

5)     That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of Mielle Trademarks are increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

6)     In the alternative, Plaintiff is awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of not less than $1,000 and not more than $2,000,000 for each and every use of Mielle Trademarks;

7)     Plaintiff is further entitled to recover its reasonable attorney's fees and full costs for bringing this action pursuant to 17 U.S.C. § 1117(a); and

8)     Award any and all other relief that this Court deems just and proper.

Dated: January 17, 2025     Respectfully submitted,

          By:  */s/ Scott E. Rogers*
              Scott E. Rogers (IL 6237984)
              Brett J. Geschke (IL 6337873)
              UB Greensfelder LLP
              200 West Madison Street, Suite 3300
              Chicago, Illinois 60606
              Telephone: (312) 658-6530
              Fax: (216) 583-7001
              Email: srogers@ubglaw.com
                 bgeschke@ubglaw.com

              Jocelyn C. Smith (OH 100227)
              UB Greensfelder LLP
              65 East State Street, Suite 1100
              Columbus, Ohio 43215
              Telephone: (614) 292-0044
              Fax: (216) 583-7001
              Email: jcsmith@ubglaw.com

              *Attorneys for Plaintiff Mielle*
              *Organics, LLC*